1  MARC J. WINTHROP – State Bar No. 63218
    mwinthrop@winthropcouchot.com
2  SEAN A. O'KEEFE – State Bar No 122417
    sokeefe@winthropcouchot.com
3  **WINTHROP COUCHOT**
    **PROFESSIONAL CORPORATION**
4  660 Newport Center Drive, Fourth Floor
    Newport Beach, CA 92660
5  Telephone: (949) 720-4100
    Facsimile: (949) 720-4111
6
    [Proposed] General Insolvency Counsel for
7  Debtor and Debtor-in-Possession

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                  **SANTA ANA DIVISION**

11

12  In re:

13  ☐ BACCHUS DEVELOPMENT, INC.

14  ☒ BACCHUS INVESTMENT GROUP, LLC
    ☒ BACCHUS COMMERCIAL, LLC
15

16  ☐ All Debtors

17          Debtors and
            Debtors-in-Possession.
18

19

20

21

22

23

24

25

26

27

28

| |
|---|
| Case No.   8:09-19457 RK |
| Jointly Administered with Case Nos. 8:09-19460 RK; and 8:09-15462 RK |
| Chapter 11 Proceedings |
| **DEBTOR'S <u>EMERGENCY</u> MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF STEVEN M. BREN, WILLIAM CREELMAN AND TIBOR KELEMEN IN SUPPORT THEREOF** |
| DATE:  [To Be Set] TIME: PLACE: Ctrm. "5D " |

1      Bacchus Commercial, LLC ("Commercial") and related debtors Bacchus Investment,

2  LLC ("Investment") , and Bacchus Development ("Development") (collectively "the "Debtors"),

3  hereby move the Court, <u>on an emergency basis,</u> for an order granting the following relief:

4     A)    Authorizing the Debtors to use any and all "cash collateral," as that term

5           is defined in 11 U.S.C. § 363(a), now on hand or hereafter collected, in

6           accordance with the budget attached to the accompanying declaration of

7           Steven M. Bren as Exhibit "1" (the "Budget");

8     B)    Authorizing the Debtors to exceed any line item in the budget by up to

9           fifteen percent (15%) in any one month, as long as the overage for all

10          items in the aggregate does not exceed the greater of fifteen percent (15%)

11          of the total budget amount for that month any unused amounts may be

12          carried to future weeks; and

13     C)    Such further relief as the Court deems just and proper.

14     This Motion is made on the basis of the appended Declarations of Steven M. Bren,

15  Williams Creelman, Tibor Kelemen, the within points and authorities, and on such other evidence

16  as the Court elects to consider prior to or at the hearing on this matter.

17  DATED:  September 15, 2009       **WINTHROP COUCHOT**

18                           **PROFESSIONAL CORPORATION**

19

20                       By:  _/s/ Sean A. O'Keefe_____

21                           Marc J. Winthrop
                             Sean A. O'Keefe

22                        [Proposed] Insolvency Counsel for Debtor and
                        Debtor-in-Possession

23

24

25

26

27

28

MAINDOCS-#133597-v1-BacchusCCMtn.DOC

# MEMORANDUM OF POINTS AND AUTHORITIES

## I

## SUMMARY OF MOTION AND NEED FOR EMERGENCY RELIEF

The Debtors, who share common ownership, filed petitions under Chapter 11 of the United States Bankruptcy Code on September 4, 2009. They collectively own fifty-four commercial buildings and a single family home. Commercial owns forty-three of the buildings (the "BC Buildings"). Investment owns the remaining eleven (the "BIG Buildings") (and the single family home). All of the buildings owned by Commercial are actively being marketed for sale. The eleven buildings owned by Investment are leased to third parties. Development owns all of the membership interests in the Commercial and Investment, and this corporation provides management services to the latter debtors.

In order to maintain the value of the BC Buildings and the BIG Buildings, the Debtors must have the immediate ability to pay certain costs and expenses associated with the operation, management and sale of these assets. These costs include taxes, utilities, association dues, marketing and sales costs, and the management fee charged by Development.

Thirty-two of BC Buildings are subject to a lien held by one bank group led by Union Bank, and eleven are subject to a lien held by another bank group, also led by Union Bank. The lien held by the former bank group secures a debt in the approximate amount in the $43M and the lien held by the latter group secures a debt in the approximate amount of $12M. Union Bank holds lien on the eleven buildings owned by Investment in its own right. This lien secures a loan in the approximate amount of $20M.

Based upon the above described liens, Union Bank contends that the proceeds generated from the sale and lease of the BC Buildings and the BIG Buildings constitutes the banks groups' "cash collateral" as that term is defined in 11 U.S.C. § 363, or Union Bank's cash collateral. In order to use this source of cash to pay the ordinary and necessary expenses referenced above, the Debtors must obtain an order of this Court authorizing such usage. This relief will not impair the rights of the existing secured creditors. In re Princeton Square Associates, L.P., 201 B.R. 90, 96 (Bankr. S.D.N.Y. 1995) ("The use of the rents by a debtor in possession to maintain the property

MAINDOCS-#133597-v1-BacchusCCMtn.DOC

to the same extent that a receiver of rents would use the rents does no economic harm to the lender."). It will merely fund the ordinary and necessary costs associated with the preservation of their collateral.

The Debtors are seeking the foregoing relief on an expedited basis for the following reasons. First, in order to preserve the value of the BC Buildings and the BIG Buildings, and the office parks where they are located, the costs associated with the maintenance and preservation of these assets must be timely paid. Second, pursuant to the lease arrangements in place at thirteen of the buildings, the Debtors are required to pay certain costs. If the Debtors fail to pay these costs the tenants will be entitled to terminate their leases and vacate depriving the estate of approximately $400,000 in lease revenues. A detailed listed of the expenses that must be timely paid is itemized in the Budget.

## II

## GENERAL BACKGROUND FACTS

**A.      The Debtor and Related Entities.** Commercial and Investment are California limited liability companies.  Development, which is the sole member and manager of these entities, is a California corporation.  Steven M. Bren owns all of the common stock of Development.[1]

Development is one of the premier commercial real estate development firms in Orange County, California. The company focuses on developing smaller Class A commercial buildings for the owner-user tenant. These buildings typically range in size from 5,000 to 20,000 square feet. During the last five years Development has developed the following three projects within the City of Irvine that are relevant to the pending Chapter 11 cases:

1.      Bacchus Office Park. Bacchus Office Park ("BOP") is a twenty-two acre office park located at the intersection of Irvine Center Drive and Bake Parkway in Irvine, California, which has seventy-nine commercial buildings and condominium units ranging in size

---

[1] The Debtors are managed by a common management team, they share a common secured creditor, common unsecured creditors, common inter-company guarantees, and they operate under the same company trade name.

1    from 1,000 to 20,000 square feet. All of the buildings within BOP are located on separately

2    deeded parcels of land and they have all been sold. All of the BIG Buildings (owned by

3    Investment) are located within BOP.

4           2.    <u>Jeffrey Office Park</u>. Jeffrey Office Park ("JOP") is a twenty acre office park

5    located at the intersection of Jeffrey Road and the Interstate 5 freeway. Commercial built fifty

6    buildings within this park ranging in size from 5,000 square feet to 20,000 square feet. All of the

7    buildings within JOP are located on separately deed parcels. Eighteen of the buildings within JOP

8    have been sold. Commercial holds title to the remaining thirty-two buildings, four of which are

9    leased and the others are actively being offered for sale.

10          The thirty-two buildings within JOP that are owned by Commercial are subject to a

11    first priority lien in favor of Union Bank. This lien secures the approximate sum of $43,000,000

12    owing under the terms of that certain *Construction Loan* dated July 7, 2006, entered into by and

13    between Union Bank as lender and agent, and Commercial as borrower (the "JOP Loan"). Mr.

14    Bren and Development executed a payment guaranty in favor of Union Bank as additional

15    security for the JOP Loan.

16           3.    <u>Bacchus Signature Series</u>. Bacchus Signature Series ("BSS") is an eighteen

17    acre office park located at the intersection of Irvine Center Drive and Lake Forest Drive.

18    Commercial built forty buildings within this park ranging in size from 5,000 square feet to 10,000

19    square feet. All of the buildings within BSS are located on separately deed parcels. Twenty nine of

20    the buildings within BSS have been sold. Commercial holds title to the remaining eleven

21    buildings. Two of these building have been leased to third parties. The nine other buildings are

22    vacant and they are actively being offered for sale.

23          The eleven buildings within BSS that are owned by Commercial are subject to a

24    first priority lien in favor of Union Bank. This lien secures the approximate sum of $12,000,000

25    owing under the terms of that certain *Construction Loan* dated November 10, 2006, entered into

26    by and between Union Bank as lender and agent, and Commercial as borrower (the "BSS Loan").

27    Mr. Bren and Development executed a payment guaranty in favor of Union Bank as additional

28    security for the BSS Loan.

MAINDOCS-#133597-v1-BacchusCCMtn.DOC

1    **B.    Events Precipitating The Chapter 11 Filing**. The severe decline in economic

2    conditions experienced both nationally and locally in late 2008, coupled with the near collapse of

3    the national credit markets in late 2008, reduced both sales velocities and pricing at both BSS and

4    JOP.  Although units continued to sell within both park, and the balances due under the terms of

5    both the JOP Loan and the BSS Loan were being steadily reduced through sales (by over

6    $40,000,000), the BSS Loan matured in May of 2009, with a balance remaining unpaid. Although

7    efforts were made to negotiate a reasonable forbearance arrangement with Union Bank, these

8    efforts were unsuccessful. The bank elected to declare a default under all three of its loan

9    arrangements and to pursue its enforcement remedies. This forced the Debtor, Commercial and

10    Bacchus to file the instant Chapter 11 proceeding in order to obtain a breathing spell within which

11    to reorganize their affairs.

12    **C.    The Debtors' Assets and Liabilities**. The thirty-two BC Buildings subject to the

13    JOP Loan have a fair market value of between $48 million and $53 million. These figures assume

14    that the buildings will be sold over time through an effective sales program, and that the market

15    will be generally flat most of calendar year 2010 and experience general appreciation during the

16    last quarter of the year 2010 as sales and marketing  progress. At the higher end of this market

17    value range, sufficient proceeds will be available to retire the JOP Loan and to pay the claims of

18    non-insider unsecured creditors.

19    The eleven buildings subject to the BSS Loan have fair market value of between $12

20    million and $16 million. While proceeds at the low end of this range will not fully cover the

21    estimated secured debt on these properties, comfortable coverage is afforded at the mid and

22    higher end of the value range (coverage of the BSS Loan ranges from 95% to 124%).   Here again

23    these figures assume that the buildings will be sold through an ordinary course sales program and

24    that reasonable appreciation will occur during the last quarter of the year 2010.

25    The eleven BIG Buildings have an estimated value of between $26 million and $31

26    million. Accordingly, the sale of these assets would more than cover the estimated secured debt of

27    the BOP Loan, and all non-insider unsecured claims. These figures are also based upon the above

28    assumptions.

MAINDOCS-#133597-v1-BacchusCCMtn.DOC

**D.**    **The Use of Cash Collateral.** The BC Buildings and the BIG Buildings are Class A commercial assets located in one of the most desirable business locations within Orange County. Although adverse economic conditions and problems in the credit markets reduced the value of these buildings during the late 2007 and 2008 time frame, this value decline has ceased. As of the Petition Date, the value of the buildings has stabilized and in fact there is evidence that values may increase in the near future as economic conditions improve.

In summary, the value of the assets securing the two liens being administered by Union Bank as agent (the "Secured Claims") remains stable and may well be increasing. This alone provides Union Bank and the two bank groups' holdings these lien rights the requisite adequate protection necessary for the use of cash collateral proposed herein. Moreover, the expenditures proposed in the budget are expenses that must be paid to preserve the value of buildings, in the ordinary course, and to pay the costs associated with the sale of the buildings. Accordingly, these expenditures do not deplete the value of collateral securing the three loans, since they would have to be paid even if the banks acquired title to the buildings.

**E.**    **The Cash Collateral Budget.** The Budget was prepared by the Debtors' financial advisors with the benefit of input from the Debtors' management team. The payments provided for therein are limited to those that were deemed necessary to maintain and preserve the value of the buildings, and to provide the funds necessary to market and sell these buildings for their fair market value.

The Budget for the Debtors was prepared on a consolidated basis, since the Debtors have historically operated in this manner. However, at the request of Union Bank, the Debtors have also itemized the expenses on an entity-by-entity basis and have further itemized these expenses on a park-by-park basis. The Debtors have also scheduled out the income attributable to each entity and each park. To the greatest extent possible the budget matches income and expenses on and entity-by-entity basis and on a park-by-park basis. For example, the JOP association costs will be paid from either the proceeds of the sales of buildings within JOP, or from the lease proceeds generated from the buildings within this park.  This will insure that the pool of collateral in each entity only pays for its share of the costs.

MAINDOCS-#133597-v1-BacchusCCMtn.DOC

1     The expenses provided for in the Budget are ordinary course expenses that any custodian

2 or receiver would be compelled to pay sustain the value of these assets. The Debtors' use of cash

3 collateral for this purpose is appropriate and should be authorized since it provides the affected

4 secured creditors the adequate protection they are entitled to under the Bankruptcy Code.[2]

5 <div align="center">**III**</div>

6 <div align="center">**RELIEF IS JUSTIFIED ON AN EMERGENCY BASIS**</div>

7     In section 363(c)(3), Congress recognized that preliminary hearings on cash collateral

8 would frequently be held on an emergency basis by stating therein that such hearing "shall be

9 scheduled in accordance with the needs of the debtor". 11 U.S.C. § 363(c)(3).  The courts have

10 also recognized that emergency relief on the use of cash collateral is necessary after a case is filed.

11 In re Center Wholesale, Inc., 759 F. 2d 1440, 1444 (9th Cir. 1985) ("We realize that 'in certain

12 circumstances the entire reorganization effort may be thwarted if emergency relief is withheld'

13 and that reorganization under the Bankruptcy Code 'is a perilous process, seldom more so than at

14 the outset of the proceedings when the debtor is often without sufficient cash flow to fund

15 essential business operations.' … It is for this very reason that Congress specified that hearings

16 concerning the use of cash collateral 'shall be scheduled in accordance with the needs of the

17 debtor.' "); In re Sullivan Ford Sales, 2 B.R. 350, 355 (Bankr.D.Me.1980).

18     As indicated above, in order to preserve and maintain their assets, the Debtors must have

19 the ability to pay the expenses set forth in the Budget. Without this relief, these core assets will

20

21 ───────────────────

[2] Not infrequently a lender will endeavor to drive a debtor out of Chapter 11 by restricting or

22 micromanaging the use of cash collateral to such a degree that reorganization is impossible. This stratagem should be rejected. See, In re Princeton Square Associates, L.P., 201 B.R. 90, 95 (Bankr..S.D.N.Y.1996)

23 ("Unless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the trustee may operate the debtor's business." The entire presumption underlying Chapter 11 is that the debtor in possession will continue to operate the debtor's business. The Lender would like to stand this

24 presumption on its head by denying the Debtor in its capacity as debtor in possession the ability to operate its business by preventing the use of the rents without the necessity of proving that cause for the

25 appointment of a trustee exists. See Code § 1104(a).")

26

27

28

1    decline in value damaging the interests of all creditors and this reorganization effort. On these

2    facts and circumstances good cause exists for an expedited hearing on limited notice.

## IV

## THE USE OF THE CASH COLLATERAL SHOULD BE AUTHORIZED IN

## ACCORDANCE WITH THE BUDGET ATTACHED AS EXHIBIT "1"

6    To obtain court authorization to use cash collateral, a debtor must establish that the

7    "interest" of creditors holding liens on the subject collateral will remain "adequately protected."

8    11 U.S.C. § 363(e). Pursuant to United States v. Timbers of Inwood Forest, 484 U.S. 365, 108 S.

9    Ct 626 (1988), the "interest in property" entitled to adequate protection under 11 U.S.C. §363(e) is

10   no more or less than the "value of the collateral" that is subject to the secured creditor's lien.

11   Under the Timbers' holding, a debtor is merely required to show that the secured creditor's

12   collateral will not decline in value under the debtor's proposed usage of cash collateral. Timbers,

13   108 S. Ct at 633; In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D.Mass. 1990) (So long

14   as the receivables being collected and used by the debtor are being replaced by sufficient new

15   receivables in which the creditor is granted a security interest, the creditor is adequately protected);

16   In re Johnson, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (Since value of the collateral has not

17   declined, the bank is not impaired and is not entitled to receive adequate protection payments); In

18   re Century Inv. Fund VII, Ltd. Partnership, 96 B.R. 884, 887 (Bankr. E.D. Wis. 1989) (Where

19   value appears to be stable, creditor is not entitled to adequate protection payments); In re Kessler,

20   86 B.R. 134, 136 (Bankr. C.D. Ill. 1988) (under Timbers, the sellers are not entitled to adequate

21   protection payments, as there was no showing the 80-acre tract was depreciating in value); In re

22   Anderson, 88 B.R. 877, 889 (Bankr. N.D. Ind. 1988) (Secured creditor required to show a

23   necessity for adequate protection by showing a decline in asset value from the petition date); In re

24   McCombs Properties VI, Ltd., 88 B.R. 261 (Bankr. C.D. Cal. 1988); In re Elmore, 94 B.R. 670

25   (Bankr. C.D. Cal. 1988). Alternatively, a debtor can make an adequate protection showing even

26   where the collateral is declining in value, as long as the creditor's interest therein is protected by a

27   reasonable equity cushion. See, In re Mellor, 734 F. 2d 1396 (9th Cir. 1984); In re Harrington &

28   Richardson, Inc., 48 B.R. 431 (Bankr. D.Mass. 1985); In re Mccombs Properties Vi, Ltd., 88 B.R.

1 | 261 (Bankr. C.D.Cal. 1988).

2 |     As established herein and in the accompanying declaration, the cash collateral pool

3 | securing the liens being administered by Union Bank will not decline through the usage proposed

4 | by herein.  To the contrary, this usage will preserve and increase the overall value of this

5 | collateral.

6 | <center>**V**</center>

7 | <center>**<u>CONCLUSION</u>**</center>

8 |     For the foregoing reasons, the Debtor would respectively request that the Court grant the

9 | relief prayed for herein.

10 | DATED:  September 15, 2009          **WINTHROP COUCHOT**

11 |                     **PROFESSIONAL CORPORATION**

12 |

13 |             By:*/s/ Sean A. O'Keefe*

14 |                Sean A. OKeefe, attorneys for
               the Debtor and Debtor-in-Possession

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

MAINDOCS-#133597-v1-BacchusCCMtn.DOC

## DECLARATION OF STEVEN M. BREN

I, Steven M. Bren, hereby declare and state as follows:

1.      I am over the age of eighteen years. The following facts are within my personal knowledge and if called upon to testify to the same I could and would testify competently thereto.

2.      I am the President of Bacchus Development, a California corporation ("Development"). Development is the sole member and manager of both Bacchus Commercial, LLC ("Commercial") and Bacchus Investment Group, LLC ("Investment") (collectively the "Bacchus Debtors").

3.      The facts stated herein are within my personal knowledge, and if called upon to testify to such facts I could and would testify competently thereto.

4.      In my role as President and founder of the Bacchus Debtors, I have been responsible for overseeing the operations and financial performance of these entities.

5.      The books and records of the Bacchus Debtors are prepared and maintained in the ordinary course of business in a consistent and business-like manner. Accordingly, the information therein is accurate and reliable.

6.      I have been actively involved in the acquisition, development, construction and sale of commercial real estate in Southern California for over twenty-years. During this time frame I have supervised the construction over one hundred commercial buildings in Irvine, California and surrounding cities.

7.      On September 4, 2009 (the "Petition Date"), the Bacchus Debtors filed petitions under Chapter 11 of the United States Bankruptcy Code.  The Bacchus Debtors' core business is the construction, management and sale of commercial real estate assets.

8.      During the last five years Bacchus Debtors have developed the following three projects in Irvine, California that are relevant to the pending Chapter 11 cases:

A.    <u>Bacchus Office Park</u>. Bacchus Office Park ("BOP") is a twenty-two acre office park located at the intersection of Irvine Center Drive and Bake Parkway in Irvine, California that was improved with seventy-nine commercial buildings and condominium units ranging in size from 1,000 to 20,000 square feet. All of the buildings within BOP are located on separately deeded parcels of land and they have all been sold. The eleven buildings owned by the Debtor are located within BOP.

B.    <u>Jeffrey Office Park</u>. Jeffrey Office Park ("JOP") is a twenty acre office park located at the intersection of Jeffrey Road and the Interstate 5 freeway. Commercial built fifty buildings within this park ranging in size from 5,000 square feet to 20,000 square feet. All of the buildings within JOP are located on separately deed parcels. Eighteen of the buildings within JOP have been sold. Commercial holds title to the remaining thirty-two buildings, four of which are leased and the others are actively being offered for sale.

The thirty-two within JOP that are owned by Commercial are subject to a first priority lien in favor of Union Bank. This lien secures the approximate sum of $43,000,000 owing under the terms of that certain *Construction Loan* dated July 7, 2006, entered into by and between Union Bank as lender and agent, and Commercial as borrower (the "JOP Loan").

C.    <u>Bacchus Signature Series</u>. Bacchus Signature Series ("BSS") is an eighteen acre office park located at the intersection of Irvine Center Drive and Lake Forest Drive. Commercial built forty buildings within this park ranging in size from 5,000 square feet to 10,000 square feet. All of the buildings within BSS are located on separately deed parcels. Twenty nine of the buildings within BSS have been sold. Commercial holds title to the remaining eleven buildings. Two of these building have been leased to third parties. The nine other buildings are vacant and they are actively being offered for sale.

The eleven buildings within BSS that are owned by Commercial are subject to a

MAINDOCS-#133597-v1-BacchusCCMtn.DOC

first priority lien in favor of Union Bank. This lien secures the approximate sum of $12,000,000

owing under the terms of that certain Construction Loan dated November 10, 2006, entered into

by and between Union Bank as lender and agent, and Commercial as borrower (the "BSS Loan").

9.   The severe decline in economic conditions experienced both nationally and locally in

late 2008, coupled with the near collapse of the national credit markets in late 2008, reduced both

sales velocities and pricing at both BSS and JOP.  Although units have continued to sell within

both parks, and the balances due under the terms of both the JOP Loan and the BSS Loan have

been and continued to reduced through sales (collectively, by over $40,000,000) the BSS Loan

matured in May of 2009, with a balance remaining unpaid. Although efforts were made to

negotiate a reasonable forbearance arrangement with Union Bank, these efforts were unsuccessful.

The bank elected to declare a default under all three of its loan arrangements and to pursue its

enforcement remedies. This forced the Bacchus Debtors to file the instant Chapter 11 proceedings

in order to obtain a breathing spell within which to reorganize their affairs.

10. The buildings owned by Commercial and Investment have strong appeal in the Orange

County market, due to the substantial number of small businesses within this geographic area.

These buildings offer user/owners the ability to acquire and own a Class A commercial buildings

in the midst of the Irvine Spectrum, which is one of the most attractive office locations in

California0

11. As of this writing four of the buildings owned by Commercial are in escrow and the

Debtors receive inquiries from buyers almost daily. If the Debtors are allowed to use cash

collateral to the ordinary and necessary expenses associated with the maintenance and

preservation of the buildings owned by Commercial and Investment, they will be able, with the

assistance of a reasonable marketing effort, to sell the balance of these buildings for their fair

market value.

12. Attached hereto as Exhibit "1" is a budget (the "Budget") that was prepared by the Debtors' financial advisors from BDO Consulting, with input and assistance from the other members of the Debtors' management team and I. The expenses detailed in the Budget are limited to those that would have to be paid by any owner of the buildings in the ordinary course of business. These expenses include property taxes, property management fees, security costs, association dues, and utilities. These expenditures will preserve the value of the buildings owned by the Debtors. In contrast, the failure to pay these expenses will result in the deterioration of these assets and the office parks where they are located.

13. The Debtors are seeking the emergency relief prayed for in the attached motion in order to avoid a disruption in services to the buildings in the JOP, BSS and BOP office parks. Utility bills must be timely paid, management and security services must be provided and association costs must be funded. If the Debtors fail to fund these critical costs, the buildings and the office parks where they are located will not only suffer immediately through tenant departures, the reputation of the entire park will suffer degrading the value of the buildings owned by all of the Debtors.

14. The expenses in the budget for marketing the buildings also benefit of the asset values. Without proper marketing, the fair market value of the buildings cannot be achieved. In fact, every dollar expended on marketing yields more than a dollar in value, since these expenditures generate more sales at higher prices.

15. Based upon their familiarity with the local market, and their direct experience with buyer interest, the Debtors are of the opinion that the value of the buildings is currently stable and there is evidence that values may increase in 2010 based upon the anticipated improvements in the local economy and based upon improvements in the credit markets.

I declare that the foregoing is true and correct under the penalty of perjury.

Executed this 15th day of September, 2009, in Orange County, California.

Steven M. Bren

## DECLARATION OF WILLIAM K. CREELMAN

I, William K. Creelman, hereby declare and state as follows:

1.      I am over the age of eighteen years. The following facts are within my personal knowledge and if called upon to testify to the same I could and would testify competently thereto.

2.      I am a Managing Director in the Business Restructuring Services ("BRS") practice of BDO Consulting. I head the BRS office in Orange County, California,

3.      I have over 25 years of experience in the finance industry, including over 17 years in the financial restructuring field. I am a Certified Insolvency and Restructuring Advisor. I specialize in provided restructuring advisory and transaction services in complex situations for distressed companies, both inside and outside of bankruptcy.

4.      In my career I have worked on matters in a variety of industries including restaurant, real estate, healthcare, manufacturing and entertainment. This work has included but is not limited to the following:

- I have led numerous complex financial advisory assignments, including evaluations of strategic alternatives, debt restructurings, valuations, identification of key operational issues, financial due diligence, assessments of quality of earnings, and evaluation of insider transactions and preference payments.

- I have provided expert testimony in bankruptcy court on financial matters.

- I have served as financial advisor for clients in matters involving, among others, Bordiers Nursery, Asyst Technologies, Millemium Pacific Icon Group, Aviat Homes, Chevys Restaurants, Nellson Nutraceutical, Tanner & Haley, Kaiser Aluminum, LandSource Communities, Fedders, C&H Sugar, Texas

1    Petrochemical Company, Cornerstone Propane, Spectrum Restaurant Group,

2    Prandium, FountainView, and Opal Concepts.

3        5.    I and the team of professionals at BRS working with me on this case prepared the

4    cash receipts and disbursements budget attached as Exhibit "1" to the Declaration of Steven M.

5    Bren (the "Budget") based upon input and financial information provided by the management team

6    (which includes certain professionals which are not employees, but which have been working

7    closely with the Debtor) at Bacchus Development ("Development"). The top page of the Budget

8    was prepared on a consolidated basis, since this is how Development, and its wholly owned

9    subsidiaries, Bacchus Commercial, LLC and Bacchus Investment Group, LLC, have typically

10    operated.

11

12        6.    However, at the request of Union Bank, we also separated the cash expenses

13    included in the Budget into the subsidiary schedules attached thereto on a legal entity-by-legal

14    entity basis, and an office-park-by-office-park basis. Accordingly, when the Budget is approved

15    the cash expenses associated with a particular debtor entity, or associated with the buildings within

16    a particular office park, will be paid from the cash receipts (whether lease receipts or sales

17    proceeds) generated from the applicable debtor entity and the applicable office park. In the case of

18    management level cash expenses, these charges have been allocated, to the extent possible, on an

19    estimated hour expended basis or on an estimated square footage basis (as appropriate), to the

20    associated assets and cash streams. In the event that the cash expenses are paid from cash receipts

21    associated with an unrelated asset or debtor during the initial stages of this case, this will be

22    addressed through a monthly reconciliation.

23

24        7.    The cash expenses set forth in the Budget reflect what we consider to be the

25    minimum necessary preserve and maintain the value of the assets and to move forward with the

26    continued sale of these assets.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I declare that the foregoing is true and correct under the penalty of perjury.

Executed this 15th day of September, 2009, in Orange County, California.

William K. Creelman

## **DECLARATION OF TIBOR KELEMEN**

I, Tibor Kelemen, hereby declare and state as follows:

1.      I am over the age of eighteen years. The following facts are within my personal knowledge and if called upon to testify to the same I could and would testify competently thereto.

2.      I am a licensed real estate sales agent.

3.      I have been employed by Bacchus Development, Bacchus Commercial, LLC and Bacchus Investment Group, LLC (collectively the "Debtors"), as an independent marketing and sales consultant for the past 6 years. In this capacity I have been principally responsible for marketing and selling the buildings owned by the Debtors within the Jeffrey Office Park, the Bacchus Office Park and the Bacchus Signature Series. As this writing I have arranged the sale over 115 buildings within these parks

4.      Through the foregoing experience I have developed knowledge and expertise regarding the buildings owned by the Debtors and the value of the same.

5.      The projection attached hereto as Exhibit "2" projects the estimated results that will be achieved through the future sale of all of the remaining buildings owned by the Debtors. I have reviewed the assumptions within this projection and believe that the projection fairly reflects what sales proceeds can be achieved by the Debtors if they are afforded the time frame provided in the projection to arrange these sales and they have a reasonable marketing budget to promote the sale of the buildings.

Given the above approach, the attached exhibit shows the thirty-two BC Buildings subject to the JOP Loan are estimated to yield net sale proceeds of between approximately $48 million and $53 million.  This will more than cover the estimated secured debt on these properties, including estimated accrued interest, of approximately $45.2 million (coverage of the JOP Loan

MAINDOCS-#133597-v1-BacchusCCMtn.DOC

ranges from 112% to 123%).   These figures assume that the buildings will be sold over time through an effective sales program, and that the market will be generally flat most of calendar year 2010 and experience reasonable appreciation during the last quarter of the year 2010 as sales and marketing efforts progress.  Should the properties not be managed properly with an appropriate and effective sales program, the estimated proceeds from sale would likely be significantly less and substantially less than the secured debt on the properties.  These reduced proceeds could be in the range of $19.5 million to $21 million as a bulk sale to an investor over a 3-4 month period.

Also, given the above approach, the attached exhibit shows the eleven BC Buildings subject to the BSS Loan are estimated to yield net sale proceeds of between approximately $12 million and $16 million.  While these proceeds will not fully cover the estimated secured debt on these properties, including estimated accrued interest, of approximately $13 million at the low end of the range, comfortable coverage is afforded at the mid and higher end of the range (coverage of the BSS Loan ranges from 94% to 124%).   These figures assume that the buildings will be sold over time through an effective sales program, and that the market will be generally flat most of calendar year 2010 and experience reasonable appreciation during the last quarter of the year 2010 as sales and marketing efforts progress.  Should the properties not be managed properly with an appropriate and effective sales program, the estimated proceeds from sale would likely be significantly less and substantially less than the secured debt on the properties.  These reduced proceeds could be in the range of $7.5 million to $8.3 million as a bulk sale to an investor over a 3-4 month period.

6.    Finally, given the above approach, the attached Exhibit 2 shows the fourteen buildings subject to the BaccHus Investment Group secured loan are estimated to yield net sale proceeds of between approximately $26 million and $31 million.  This will more than cover the estimated secured debt on these properties, including estimated accrued interest, of approximately

$20 million (coverage of the loan ranges from 132% to 155%).  These figures assume that the buildings will be sold over time through an effective sales program, and that the market will be generally flat most of calendar year 2010 and experience reasonable appreciation during the last quarter of the year 2010 as sales and marketing efforts progress.  Should the properties not be managed properly with an appropriate and effective sales program, the estimated proceeds from sale would likely be significantly less and substantially less than the secured debt on the properties.  These reduced proceeds over what might otherwise be received in a normalized sale process could be in the range of $15.8 million to $18.4 million as a bulk sale to an investor over a 3-4 month period.

       In total, estimated net sale proceeds are anticipated to range between $86 and $100 million.  This will more than cover the estimated total secured debt on these properties, including estimated accrued interest, of approximately $78 million (total coverage of the loans in aggregate range from 114% to 132%).

       7.     The assumption that the market will essentially remain flat and experience some recovery beginning in late 2010 is supported by Voit Real Estate Services in their Orange County/Second Quarter 2009 report on the commercial office market in Orange County which states: "We should see an increase in activity in the second half of 2009 from pent up demand, once financial markets correct themselves and as consumer confidence increases."

       8.     As detailed in this projection, the figures therein assume reasonable price increases in 2010. Although such price increases are not guaranteed based upon my familiarity with the market, I believe that these increments are reasonable and achievable.

       9.     I have reviewed the budget attached to the declaration to Steven M. Bren as Exhibit "1". Based upon my familiarity with the buildings owned by the Debtors and the market, I believe

that the expenditures therein are both appropriate and necessary to maintain and preserve the future net proceeds from the sale of the buildings.

I declare that the foregoing is true and correct under the penalty of perjury.

Executed this 15th day of September, 2009, in Orange County, California.

_____
Tibor Kelemen

# EXHIBIT "1"

CONFIDENTIAL

9/15/2009 10:35 AM

# EXHIBIT #1 - BUDGET
## BACCHUS DEVELOPMENT, INC - CONSOLIDATED
### PROJECTED ESTIMATED CASH RECEIPTS AND DISBURSEMENTS

| | Week 1 9/11/2009 | Week 2 9/18/2009 | Week 3 9/25/2009 | Week 4 10/2/2009 | 4-WEEK TOTAL |
|---|---|---|---|---|---|
| **Sale of Office Condominiums:** | | | | | |
| Gross Sales Proceeds | - | - | 2,995,840 | 1,881,000 | 4,876,840 |
| Other Credit for Tenant Improvement | - | - | (372,800) | - | (372,800) |
| Total Gross Sales Proceeds After Credits | - | - | 2,623,040 | 1,881,000 | 4,504,040 |
| **Closing Costs:** | | | | | |
| Property Taxes | - | - | (25,778) | (33,287) | (59,065) |
| Commissions to Participating Brokers | - | - | (78,651) | (56,420) | (135,071) |
| Commissions to Wind Water Advisors | - | - | (39,346) | (28,215) | (67,561) |
| Commissions to Bacchus Development | - | - | (39,346) | (28,215) | (67,561) |
| Plus Commission to Bacchus Development | - | - | 39,346 | 28,215 | 67,561 |
| Other Assoc Dues | - | - | (6,601) | (16,295) | (22,896) |
| Total Closing Costs | - | - | (150,616) | (134,227) | (284,843) |
| **Net Sales Proceeds** | - | - | 2,472,424 | 1,746,773 | 4,219,197 |
| **Other Cash Receipts:** | | | | | |
| Lease Receipts | - | 7,500 | - | - | 7,500 |
| Plus Receipts for Assoc dues and Utilities | - | - | - | - | - |
| **Total Other Cash Receipts** | - | 7,500 | - | - | 7,500 |
| **Operating Disbursements:** | | | | | |
| Payroll Benefits | - | (1,895) | - | (8,428) | (10,323) |
| Ordinary Course Professional Fees | - | - | (2,000) | (2,000) | (4,000) |
| Property Mgmt | - | (3,300) | - | (4,500) | (7,800) |
| Construction/Dev Management | - | (1,320) | - | (1,800) | (3,120) |
| Sales Property Inspections | - | (660) | - | (900) | (1,560) |
| General Corporate/Contract Oversight | - | (1,320) | - | (1,800) | (3,120) |
| Property Tax | | | | | |
| Assoc Dues | | | | | |
| Utilities Insurance/Maintenance | - | (9,368) | (19,625) | (13,000) | (41,993) |
| Marketing | | | | | |
| Tenant Improvements | | | | | |
| Estimated Security Deposit for Utilities | - | (6,290) | (39,541) | - | (45,821) |
| Payments Required Under Lease Agmts | | | | | |
| Other Corporate Allocations | | | | | |
| **Total Operating Disbursements** | - | (24,143) | (61,166) | (32,428) | (117,736) |
| **Net Cash Flow before Net Sales Proceeds** | - | (24,143) | (53,666) | (32,428) | (110,236) |
| **Net Cash Flow Including Net Sales Proceeds** | - | (24,143) | 2,418,758 | 1,714,345 | 4,108,961 |
| **Financing Related Disbursements:** | | | | | |
| Interest | | | | | |
| Other | | | | | |
| Repayments from Net Office Sales Proceeds | - | - | (2,433,085) | (1,718,558) | (4,151,643) |
| Less Proceeds Retained | - | - | 500,000 | 500,000 | 1,020,000 |
| Total Financing Related Disbursements | - | - | (1,933,085) | (1,218,558) | (3,151,643) |
| **Total Other Disbursements** | - | - | - | - | - |
| **Net Cash Flow (Deficit)** | - | (24,143) | 485,673 | 495,787 | 957,317 |
| **Restructuring Related Disbursements:** | | | | | |
| Professional Fees - Debtor's Counsel | | | | | |
| Professional Fees - Financial Advisor | | | | | |
| Other | | | | | |
| Total Restructuring Related Disbursements | - | - | - | - | - |
| **Adjusted Net Cash Flow (Deficit)** | - | (24,143) | 485,673 | 495,787 | 957,317 |
| Beginning Cash Balance | 177,444 | 177,444 | 153,301 | 638,975 | 177,444 |
| Adjusted Net Cash Flow (Deficit) | - | (24,143) | 485,673 | 495,787 | 957,317 |
| **Ending Cash Balance** | 177,444 | 153,301 | 638,975 | 1,134,761 | 1,134,761 |

Source: Company information and discussions with management.

CONFIDENTIAL

9/15/2009  10:35 AM

## EXHIBIT #1 - BUDGET
## BACCHUS DEVELOPMENT, INC - Corporate only
PROJECTED ESTIMATED CASH RECEIPTS AND DISBURSEMENTS

| | Week 1 9/11/2009 | Week 2 9/18/2009 | Week 3 9/25/2009 | Week 4 10/2/2009 | 4-WEEK TOTAL |
|---|---|---|---|---|---|
| **Sale of Office Condominiums:** | | | | | |
| Property Taxes | - | - | - | - | - |
| Commissions to Participating Brokers | - | - | - | - | - |
| Commissions to Wind Water Advisors | - | - | - | - | - |
| Commissions to Bacchus Development | - | - | - | - | - |
| Plus: Commission to Bacchus Development | - | - | 39,346 | 28,215 | 67,561 |
| Other - Assoc. Dues | - | - | - | - | - |
| Total Closing Costs | - | - | 39,346 | 28,215 | 67,561 |
| | | | | | |
| **Net Sales Proceeds** | - | - | 39,346 | 28,215 | 67,561 |
| | | | | | |
| **Operating Disbursements:** | | | | | |
| Payroll Benefits | (1,895) | - | - | (8,428) | (10,323) |
| Sanitary Course Professional Fees | - | - | (2,000) | (2,000) | (4,000) |
| Property Mgmt | (3,300) | - | - | (4,500) | (7,800) |
| Construction Mgt/Dev Warranty Services | (1,320) | - | - | (1,800) | (3,120) |
| Sales Property Inspections | (660) | - | - | (900) | (1,560) |
| General Corporate/Contract Oversight | (1,320) | - | - | (1,800) | (3,120) |
| Property Tax Reserve | - | - | - | - | - |
| Assoc Dues | - | - | - | - | - |
| Utilities Insurance/Maintenance | (9,368) | - | - | - | (9,368) |
| Marketing | - | - | - | - | - |
| Tenant Improvements | - | - | - | - | - |
| Estimated Security Deposit for Utilities | (6,280) | - | - | - | (6,280) |
| Payments Required Under Lease Agents | - | - | - | - | - |
| Other Corporate Allocations | 24,143 | - | 2,000 | 19,428 | 45,571 |
| Total Operating Disbursements | - | - | - | - | - |
| | | | | | |
| **Net Cash Flow before Net Sales Proceeds** | - | - | - | - | - |
| | | | | | |
| **Net Cash Flow including Net Sales Proceeds** | - | - | 39,346 | 28,215 | 67,561 |
| | | | | | |
| **Financing Related Disbursements** | | | | | |
| Interest | - | - | - | - | - |
| Other | - | - | - | - | - |
| Repayments from Net Office Sales Proceeds | - | - | - | - | - |
| Less Proceeds Retained | - | - | - | - | - |
| Total Financing Related Disbursements | - | - | - | - | - |
| | | | | | |
| Total Other Disbursements | - | - | - | - | - |
| | | | | | |
| **Net Cash Flow (Deficit)** | - | - | 39,346 | 28,215 | 67,561 |
| | | | | | |
| **Restructuring Related Disbursements:** | | | | | |
| Professional Fees - Debtor's Counsel | - | - | - | - | - |
| Professional Fees - Financial Advisor | - | - | - | - | - |
| Other | - | - | - | - | - |
| Total Restructuring Related Disbursements | - | - | - | - | - |
| | | | | | |
| **Adjusted Net Cash Flow (Deficit)** | - | - | 39,346 | 28,215 | 67,561 |
| | | | | | |
| Beginning Cash Balance | 114,442 | 114,442 | 114,442 | 153,788 | 114,442 |
| Adjusted NetCash Flow (Deficit) | - | - | 39,346 | 28,215 | 67,561 |
| Ending Cash Balance | 114,442 | 114,442 | 153,788 | 182,003 | 182,003 |

Source: Company information and discussions with management

CONFIDENTIAL

9/15/2009  10:35 AM

# EXHIBIT #1 - BUDGET
## BACCHUS INVESTMENT GROUP, LLC - BOP Leases
**PROJECTED ESTIMATED CASH RECEIPTS AND DISBURSEMENTS**

| | Week 1 9/11/2009 | Week 2 9/18/2009 | Week 3 9/25/2009 | Week 4 10/2/2009 | 4-WEEK TOTAL |
|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | |
| Lease Receipts | - | - | - | - | - |
| Plus: Receipts for Assoc dues and Utilities | - | - | 2,500 | - | 2,500 |
| **Total Cash Receipts** | - | - | 2,500 | - | 2,500 |
| **Operating Disbursements:** | | | | | |
| Payroll Benefits | | | | | |
| Ordinary Course Professional Fees | | | | | |
| Property Taxes | | | | | |
| Assoc Dues | | | | | |
| Utilities /Insurance/Maintenance | | | (7,658) | (2,000) | (9,658) |
| Tenant Improvements | | | | | |
| Estimated Security Deposit for Utilities | | | (15,315) | | (15,315) |
| Payments Required Under Lease Agmts | | | | | |
| Other Corporate Allocations | | (10,362) | (1,000) | (7,383) | (18,746) |
| **Total Operating Disbursements** | - | (10,362) | (23,973) | (9,383) | (43,719) |
| **Net Cash Flow before Net Sales Proceeds** | - | (10,362) | (21,473) | (9,383) | (41,219) |
| **Financing Related Disbursements:** | | | | | |
| Interest | | | | | |
| Other | | | | | |
| Repayments from Net Office Sales Proceed | | | | | |
| Less Proceeds Retained | | | | | |
| **Total Financing Related Disbursements** | - | - | - | - | - |
| **Total Other Disbursements** | - | - | - | - | - |
| **Net Cash Flow (Deficit)** | - | (10,362) | (21,473) | (9,383) | (41,219) |
| **Restructuring Related Disbursements:** | | | | | |
| Professional Fees - Debtor's Counsel | | | | | |
| Professional Fees - Financial Advisor | | | | | |
| Other | | | | | |
| **Total Restructuring Related Disbursements** | - | - | - | - | - |
| **Adjusted Net Cash Flow (Deficit)** | - | (10,362) | (21,473) | (9,383) | (41,219) |
| Beginning Cash Balance | 61,159 | 61,159 | 50,797 | 29,324 | 61,159 |
| Adjusted NetCash Flow (Deficit) | - | (10,362) | (21,473) | (9,383) | (41,219) |
| **Ending Cash Balance** | 61,159 | 50,797 | 29,324 | 19,940 | 19,940 |

Source: Company information and discussions with management.

Page 3 of 6

Bacchus Cash Receipts and Disbursements 4-week budget4.xls

Exhibit 1, Page 25

CONFIDENTIAL

# EXHIBIT #1 - BUDGET
## BACCHUS COMMERCIAL, LLC - CONSOLIDATED
PROJECTED ESTIMATED CASH RECEIPTS AND DISBURSEMENTS

| | Week 1 9/11/2009 | Week 2 9/18/2009 | Week 3 9/25/2009 | Week 4 10/2/2009 | 4-WEEK TOTAL |
|---|---|---|---|---|---|
| No. of Units Sold | | | | 1 | 2 |
| Soft Sold | | | 9,920 | 9,900 | 19,820 |
| **Sale of Office Condominiums** | | | | | |
| Gross Sales Proceeds | | | 2,995,840 | 1,881,000 | 2,995,840 |
| Other Credit for Tenant Improvement | | | (372,800) | | (372,800) |
| Total Gross Sales Proceeds After Credits | | | 2,623,040 | 1,881,000 | 2,623,040 |
| **Closing Costs:** | | | | | |
| Property Taxes | | | (25,778) | (33,287) | (59,065) |
| Commissions to Participating Brokers | | | (78,691) | (56,430) | (135,121) |
| Commissions to Wind Water Advisors | | | (39,346) | (28,215) | (67,561) |
| Commissions to Bacchus Development | | | (39,346) | (28,215) | (67,561) |
| Other Assoc Dues | | | (6,801) | (16,295) | (23,096) |
| Total Closing Costs | | | (189,962) | (162,442) | (352,404) |
| **Net Sales Proceeds** | | | 2,433,078 | 1,718,558 | 2,270,636 |
| **Other Cash Receipts:** | | | | | |
| Lease Receipts | | | 5,000 | - | 5,000 |
| Plus Receipts for Assoc dues and Utilities | | | - | - | - |
| Total Other Cash Receipts | | | 5,000 | - | 5,000 |
| **Operating Disbursements:** | | | | | |
| Payroll Benefits | | | - | - | - |
| Ordinary Course Professional Fees | | | - | - | - |
| Property Taxes | | | - | - | - |
| Assoc Dues | | | - | - | - |
| Utilities Insurance/Maintenance | | | (11,967) | (11,000) | (22,967) |
| Marketing | | | - | - | - |
| Tenant Improvements | | | - | - | - |
| Estimated Security Deposit for Utilities | | | - | - | - |
| Payments Required Under Lease Agnts | | | (24,225) | - | (24,225) |
| Other Corporate Allocations | | (13,780) | (1,000) | (12,045) | (26,825) |
| Total Operating Disbursements | | (13,780) | (37,192) | (23,045) | (74,018) |
| Net Cash Flow before Net Sales Proceeds | | (13,780) | (32,192) | (23,045) | (69,018) |
| Net Cash Flow including Net Sales Proceeds | | (13,780) | 2,400,886 | 1,695,513 | 2,201,619 |
| **Financing Related Disbursements:** | | | | | |
| Interest | | | - | - | - |
| Other | | | - | - | - |
| Repayments from Net Office Sales Proceed | | | (2,433,085) | (1,718,558) | (4,151,643) |
| Less Proceeds Retained | | | 500,000 | 500,000 | 1,000,000 |
| Total Financing Related Disbursements | | | (1,933,085) | (1,218,558) | (3,151,643) |
| Total Other Disbursements | | | - | - | - |
| **Net Cash Flow (Deficit)** | | (13,780) | 467,801 | 476,955 | (950,025) |
| **Restructuring Related Disbursements:** | | | | | |
| Professional Fees - Debtor's Counsel | | | - | - | - |
| Professional Fees - Financial Advisor | | | - | - | - |
| Other | | | - | - | - |
| Total Restructuring Related Disbursements | | | - | - | - |
| **Adjusted Net Cash Flow (Deficit)** | 1,843 | (13,780) | 467,801 | 476,955 | (350,025) |
| Beginning Cash Balance | | 1,843 | (11,938) | 455,863 | 1,843 |
| Adjusted NetCash Flow (Deficit) | 1,843 | (13,780) | 467,801 | 476,955 | 930,975 |
| **Ending Cash Balance** | 1,843 | (11,938) | 455,863 | 932,818 | 932,818 |

Source: Company information and discussions with management.

Bacchus Cash Receipts and Disbursements 4-week budget4.xls

9/15/2009 10:35 AM

Exhibit 1, Page 26

**EXHIBIT #1 - BUDGET**
**BACCHUS COMMERCIAL, LLC - JEFFREY OFFICE PARK**
PROJECTED ESTIMATED CASH RECEIPTS AND DISBURSEMENTS

| | Week 1 9/11/2009 | Week 2 9/18/2009 | Week 3 9/25/2009 | Week 4 10/2/2009 | 4-WEEK TOTAL |
|---|---|---|---|---|---|
| No. of Units Sold | - | - | - | 1 | 1 |
| Soft Sold | - | - | 9,920 | - | 9,920 |
| **Sale of Office Condominiums:** | | | | | |
| Gross Sales Proceeds | - | - | 2,995,840 | - | 2,995,840 |
| Other Credit for Tenant Improvement | - | - | (372,800) | - | (372,800) |
| Total Gross Sales Proceeds After Credits | - | - | 2,623,047 | - | 2,623,040 |
| **Closing Costs:** | | | | | |
| Property Taxes | | | (25,778) | | (25,778) |
| Commissions to Participating Brokers | | | (78,691) | | (78,691) |
| Commissions to Wind Water Advisors | | | (39,346) | | (39,346) |
| Commissions to Bacchus Development | | | (39,346) | | (39,346) |
| Other - Assoc. Dues | | | (6,801) | | (6,801) |
| Total Closing Costs | | | (189,962) | | (189,962) |
| **Net Sales Proceeds** | - | - | 2,433,085 | - | 2,433,078 |
| **Other Cash Receipts:** | | | | | |
| Lease Receipts | | | 5,000 | | 5,000 |
| Plus Receipts for Assoc dues and Utilities | | | - | | - |
| Total Other Cash Receipts | - | - | 5,000 | - | 5,000 |
| **Operating Disbursements:** | | | | | |
| Payroll Benefits | | | | | |
| Ordinary Course Professional Fees | | | | | |
| Property Taxes | | | | | |
| Assoc Dues | | | | | |
| Utilities/Insurance/Maintenance | | | (10,078) | (7,000) | (17,078) |
| Marketing | | | | | |
| Tenant Improvements | | | | | |
| Estimated Security Deposit for Utilities | | | | | |
| Payments Required Under Lease Agmts | | | (20,155) | | (20,155) |
| Other - Corporate Allocations | (8,070) | | (7,500) | (7,631) | (16,200) |
| Total Operating Disbursements | (8,070) | | (30,733) | (14,631) | (53,433) |
| **Net Cash Flow before Net Sales Proceeds** | (8,070) | | (30,733) | (14,631) | (53,433) |
| **Net Cash Flow including Net Sales Proceeds** | (8,070) | | 2,407,352 | (14,631) | 2,384,645 |
| **Financing Related Disbursements:** | | | | | |
| Interest | | | - | - | - |
| Other | | | - | - | - |
| Repayments from Net Office Sales Proceed | | | (2,433,085) | | (2,433,085) |
| Less: Proceeds Retained | | | 500,000 | | 500,000 |
| Total Financing Related Disbursements | | | (1,933,085) | | (1,933,085) |
| **Total Other Disbursements** | | | | | |
| **Net Cash Flow (Deficit)** | (8,070) | | 474,267 | (14,631) | 451,560 |
| **Restructuring Related Disbursements:** | | | | | |
| Professional Fees - Debtor's Counsel | | | | | |
| Professional Fees - Financial Advisor | | | | | |
| Other | | | | | |
| **Total Restructuring Related Disbursements** | | | | | |
| **Adjusted Net Cash Flow (Deficit)** | (8,070) | | 474,267 | (14,631) | 451,560 |
| Beginning Cash Balance | | | (8,070) | 466,197 | - |
| Adjusted Net Cash Flow (Deficit) | (8,070) | | 474,267 | (14,631) | 451,567 |
| Ending Cash Balance | (8,070) | | 466,197 | 451,567 | 451,567 |

Source: Company information and discussions with management. See Assumptions page for detail.

CONFIDENTIAL

9/15/2009 10:35 AM

Exhibit 1, Page 27

CONFIDENTIAL

9/15/2009, 10:35 AM

# EXHIBIT #1 - BUDGET
## BACCHUS COMMERCIAL, LLC - BACCHUS SIGNATURE SERIES
PROJECTED ESTIMATED CASH RECEIPTS AND DISBURSEMENTS

| | Week 1 9/11/2009 | Week 2 9/18/2009 | Week 3 9/25/2009 | Week 4 10/2/2009 | 4-WEEK TOTAL |
|---|---|---|---|---|---|
| No. of Units Sold | - | - | - | 1 | 1 |
| Sqft Sold | - | - | - | 9,900 | 9,900 |
| **Sale of Office Condominium:** | | | | | |
| Gross Sales Proceeds | - | - | - | 1,881,000 | - |
| Other: Credit for Tenant Improvement | - | - | - | - | - |
| Total Gross Sales Proceeds After Credits | - | - | - | 1,881,000 | - |
| **Closing Costs:** | | | | | |
| Property Taxes | - | - | - | (33,287) | (33,287) |
| Commissions to Participating Brokers | - | - | - | (56,430) | (56,430) |
| Commissions to Wind Water Advisors | - | - | - | (28,215) | (28,215) |
| Commissions to Bacchus Development | - | - | - | (28,215) | (28,215) |
| Other: Assoc. Dues | - | - | - | (16,295) | (16,295) |
| Total Closing Costs | - | - | - | (162,442) | (162,442) |
| **Net Sales Proceeds** | - | - | - | 1,718,558 | (162,442) |
| **Other Cash Receipts:** | | | | | |
| Lease Receipts | - | - | - | - | - |
| Plus Receipts for Assoc dues and Utilities | - | - | - | - | - |
| **Total Other Cash Receipts** | - | - | - | - | - |
| **Operating Disbursements:** | | | | | |
| Payroll Benefits | - | - | - | - | - |
| Ordinary Course Professional Fees | - | - | - | - | - |
| Property Taxes | - | - | - | - | - |
| Assoc Dues | - | - | - | - | - |
| Utilities/Insurance/Maintenance | - | (1,889) | - | (4,000) | (5,889) |
| Marketing | - | - | - | - | - |
| Tenant Improvements | - | - | - | - | - |
| Estimated Security Deposit for Utilities | - | (4,070) | - | - | (4,070) |
| Payments Required Under Lease Agmts | - | - | - | - | - |
| Other: Corporate Allocations | (5,711) | (500) | (6,459) | (4,414) | (10,625) |
| **Total Operating Disbursements** | (5,711) | (6,459) | (6,459) | (8,414) | (20,584) |
| **Net Cash Flow before Net Sales Proceeds** | (5,711) | (6,459) | (6,459) | (8,414) | (20,584) |
| **Net Cash Flow including Net Sales Proceeds** | (5,711) | (6,459) | (6,459) | 1,710,144 | (183,026) |
| **Financing Related Disbursements:** | | | | | |
| Interest | - | - | - | - | - |
| Other | - | - | - | - | - |
| Repayments from Net Office Sales Proceed | - | - | - | (1,718,558) | (1,718,558) |
| Less: Proceeds Retained | - | - | - | 500,000 | 500,000 |
| Total Financing Related Disbursements | - | - | - | (1,218,558) | (1,218,558) |
| **Total Other Disbursements** | - | - | - | - | - |
| **Net Cash Flow (Deficit)** | (5,711) | (6,459) | (6,459) | 491,586 | (1,401,584) |
| **Restructuring Related Disbursements:** | | | | | |
| Professional Fees - Debtor's Counsel | - | - | - | - | - |
| Professional Fees - Financial Advisor | - | - | - | - | - |
| Other | - | - | - | - | - |
| Total Restructuring Related Disbursements | - | - | - | - | - |
| **Adjusted Net Cash Flow (Deficit)** | (5,711) | (6,459) | (6,459) | 491,586 | (1,401,584) |
| Beginning Cash Balance | - | (5,711) | (12,170) | (12,170) | (12,170) |
| Adjusted Net Cash Flow (Deficit) | (5,711) | (6,459) | (6,459) | 491,586 | 491,586 |
| Ending Cash Balance | (5,711) | (12,170) | (12,170) | 479,416 | 479,416 |

Source: Company information and discussions with management.

Bacchus Cash Receipts and Disbursements 4-week budget4.xls

Page 6 of 6

# EXHIBIT "2"

CONFIDENTIAL

# Exhibit #2

**Bacchus Development Inc.**
*(US Dollars)*

**Key Statistics**

| | Jeffrey Office Park | | Bacchus Signature Series | | Bacchus Investment Group | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Min | Max | Min | Max | Min | Max | Min | Max |
| **Average** | | | | | | | | |
| $ / Square Foot | $285 | $314 | $203 | $264 | $291 | $341 | $272 | $312 |
| Square Feet / Sale | 5,828 | | 6,032 | | 7,175 | | 6,198 | |
| Buildings Available | 32 | | 11 | | 11 | | 54 | |
| **Debt** | | | | | | | | |
| Sales Proceeds | $53,225,760 | $59,548,336 | $13,450,440 | $17,485,572 | $29,267,200 | $34,242,624 | $95,943,400 | $110,276,532 |
| Less: Closing Expenses | $5,197,894 | $5,623,700 | $1,465,608 | $1,788,418 | $2,897,140 | $3,295,174 | $9,560,642 | $10,707,293 |
| Net Estimated Proceeds | $48,027,866 | $52,924,636 | $11,984,832 | $15,697,154 | $26,370,060 | $30,947,450 | $86,382,758 | $99,569,239 |
| Less: Debt | $43,028,000 | $43,028,000 | $12,707,000 | $12,707,000 | $19,936,000 | $19,936,000 | $75,671,000 | $75,671,000 |
| Less: Accrued Interest | $2,240,709 | $2,240,709 | $392,315 | $392,315 | $195,302 | $195,302 | $2,828,326 | $2,828,326 |
| Surplus / (Deficiency) | $2,759,156 | $7,655,926 | ($1,114,483) | $2,597,838 | $6,238,759 | $10,816,149 | $7,883,432 | $21,069,913 |
| % Coverage | 111.6% | 123.0% | 94.3% | 123.5% | 132.3% | 155.2% | 114.2% | 131.6% |

Exhibit 2, Page 29

# Exhibit #2

*Overview of Proceeds and Avg. $ / Sq Ft by Quarter*

### Total

| Quarter | Sold | Cumulative | Gross Proceeds | Cumlative | Wgt. Avg $ / Sq Ft | % Change |
|---------|------|-----------|----------------|-----------|--------------------|----------|
| Q3-09 | 4 | 7% | $7,456,040 | 8% | $251 | (6.0%) |
| Q4-09 | 8 | 21% | $14,597,130 | 23% | $262 | 4.5% |
| Q1-10 | 10 | 39% | $24,725,450 | 49% | $274 | (3.6%) |
| Q2-10 | 12 | 60% | $18,001,100 | 68% | $275 | (0.5%) |
| Q3-10 | 13 | 82% | $16,526,720 | 85% | $273 | 11.3% |
| Q4-10 | 6 | 93% | $8,347,830 | 93% | $277 | 0.8% |
| Q1-11 | 4 | 100% | $6,289,130 | 100% | $294 | 3.6% |
| Total | 57 | | $95,943,400 | | $272 | |

### JOP — Jeffrey Office Park

| Quarter | Sold | Cumulative | Gross Proceeds | Cumlative | Wgt. Avg $ / Sq Ft | % Change | |
|---------|------|-----------|----------------|-----------|--------------------|----------|---|
| Q3-09 | 3 | 9% | $5,575,040 | 10% | $281 | (9.4%) | (1) |
| Q4-09 | 3 | 19% | $4,702,080 | 19% | $296 | 5.4% | |
| Q1-10 | 5 | 34% | $11,854,400 | 42% | $291 | (1.6%) | |
| Q2-10 | 7 | 56% | $11,656,000 | 63% | $294 | 0.8% | |
| Q3-10 | 8 | 81% | $10,664,000 | 84% | $269 | (8.5%) | |
| Q4-10 | 3 | 91% | $4,092,000 | 91% | $275 | 2.3% | |
| Q1-11 | 3 | 100% | $4,682,240 | 100% | $295 | 7.3% | |
| Total | 32 | | $53,225,760 | | $285 | | |

### BSS — Bacchus Signature Series

| Quarter | Sold | Cumulative | Gross Proceeds | Cumlative | Wgt. Avg $ / Sq Ft | % Change | |
|---------|------|-----------|----------------|-----------|--------------------|----------|---|
| Q3-09 | 1 | 9% | $1,881,000 | 14% | $190 | (2.6%) | (2) |
| Q4-09 | 4 | 45% | $3,895,650 | 43% | $197 | 3.6% | |
| Q1-10 | 2 | 64% | $2,747,250 | 63% | $185 | (6.0%) | |
| Q2-10 | 2 | 82% | $1,831,500 | 77% | $185 | 0.0% | |
| Q3-10 | 1 | 91% | $1,547,520 | 88% | $260 | 40.5% | (3) |
| Q4-10 | 1 | 100% | $1,547,520 | 100% | $260 | 0.0% | |
| Q1-11 | 0 | 100% | $0 | 100% | - | NA | |
| Total | 11 | | $13,450,440 | | $203 | | |

### BIG — Bacchus Investment Group

| Quarter | Sold | Cumlative | Gross Proceeds | Cumlative | Wgt. Avg $ / Sq Ft | % Change | |
|---------|------|-----------|----------------|-----------|--------------------|----------|---|
| Q3-09 | 0 | 0% | $0 | 0% | - | NA | |
| Q4-09 | 1 | 7% | $5,999,400 | 20% | $300 | NA | (4) |
| Q1-10 | 3 | 29% | $10,123,800 | 55% | $291 | (3.1%) | |
| Q2-10 | 3 | 50% | $4,513,600 | 71% | $284 | (2.2%) | |
| Q3-10 | 4 | 79% | $4,315,200 | 85% | $290 | 2.0% | |
| Q4-10 | 2 | 93% | $2,708,310 | 95% | $290 | 0.0% | |
| Q1-11 | 1 | 100% | $1,606,890 | 100% | $290 | 0.0% | |
| Total | 14 | | $29,267,200 | | $291 | | |

Source: The Company, court documents and discussions with Wind Water Advisors ("WMA").
(1) The most recent sale for the Jeffrey Office Park was for $310 / square foot in July 2009 which represents a 9.4% price decline for Q3-09.
(4) The most recent sale for the Jeffrey Office Park was for $310 / square foot in August 2009, which represents a 2.6% price decline for Q3-09.
(3) This unit has tenant improvements which increases the estimated average $ / Square Foot asking price.
(4) No relevant comparable prior sale prices exist for the Bacchus Investment Group units. The most recent sale occurred in 2008 and is not a comparable sale.

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive., 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as **DEBTOR'S EMERGENCY MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF STEVEN M. BREN, WILLIAM CREELMAN AND TIBOR KELEMEN IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On September 18, 2009 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served): On September 18, 2009  I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 18, 2009 | Susan Connor | |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

1

2

## NEF SERVICE LIST

3

- Richard W Brunette    rbrunette@sheppardmullin.com
- Jesse S Finlayson    jfinlayson@faw-law.com, wmills@faw-law.com
- Michael J Hauser    michael.hauser@usdoj.gov
- Garrick A Hollander    sconnor@winthropcouchot.com
- Sean A Okeefe    sokeefe@okeefelc.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Marc J Winthrop    pj@winthropcouchot.com

4

5

6

7

## OVERNIGHT SERVICE LIST

8

9

| | | |
|---|---|---|
| Bacchus Group<br>Steven M. Bren<br>8801 Research Drive<br>Irvine, CA 92618 | U.S. Trustee's Office<br>Michael Hauser, Esq.<br>411 West Fourth Street<br>Santa Ana, CA 92701 | Bacchus Group<br>Combined Secured/20Largest<br>Document No.133249 |
| Union Bank of California<br>Real Estate Industries<br>Michael S. Samuel, VP<br>18300 Von Karman Ave., #340<br>Irvine, CA 92612 | Counsel to Secured Creditor<br>Sheppard Mullin Richter & Hampton LLP<br>Richard W. Brunette, Esq.<br>Aaron J. Malo, Esq.<br>333 South Hope St., 43rd Fl.<br>Los Angeles, CA 90071-1448 | |
| Aetna Attn: Irene Krinsky<br>c/o Azonic Insurance Agency<br>1617 Westcliff Dr., #211<br>Newport Beach, CA 92660 | **Utility**<br>Cox Communications<br>Attn: Paul Orona/Marcia Davis<br>29947 Avenida De Las Banderas<br>Rancho Santa Margarita, CA 92688 | Jeffrey Ofc Pk Onrs Assn<br>c/o Mar West RE-Craig<br>Stevens<br>P.O. Box 500608<br>San Diego, CA 92150-0608 |
| American Express<br>Attn: Corporate Officer<br>P.O.Box 297813<br>Ft. Lauderdale, FL 33329-9785 | De Lage Landen Financial Services<br>Attn: 000000000407407/Crp Ofcr<br>P.O. Box 41601<br>Philadelphia, PA 19101-1601 | KPRS Construction Services<br>Attn: Lev Rabinovich<br>2850 Saturn Street<br>Brea, CA 92821 |
| Arrowhead<br>Attn: Corporate Officer<br>P.O.Box 52237<br>Phoenix AZ 85072-2237 | Delta Dental Atn Irene Krinsky<br>c/o Azonic Ins Agency<br>1617 Westcliff Dr., #211,<br>Newport Beach, CA 92660 | Lead Tracking Solutions<br>Attn: Karen Tyler<br>3188-L Airway Avenue<br>Costa Mesa, CA 92626 |
| **Utility**<br>AT & T<br>Attn: Corporate Officer<br>Sacramento, CA 95887-0001 | First American Title<br>Attn: Ed Luque Acc Rec Dept<br>5 First American Way<br>Santa Ana, CA 92707 | Lee & Associates<br>Attn: Rob Rader<br>7700 Irvine Center Drive<br>Irvine, CA 92618 |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#133597-v1-BacchusCCMtn.DOC

1
2
3

Bacchus Ofc Pk Atn C. Stevens
Bacchus Signature Atn C. Stevens
Brenexus c/o Com In Attn C. Stevens
c/o Mar West Real Estate
PO Box 500608
San Diego, CA 92150-0608

GE Capital
Attn: Corporate Officer
P.O.Box 31001-0271
Pasadena Ca 91110-0271

Los Angeles Times.
Attn: Johnathan Mundez
P.O.Box 60185
Los Angeles, CA 90060-0185

4
5
6

Churm Publishing
Attn: Jill Perisich
1451 Quail St., #201
Newport Beach, CA 92660

**Utility**
Irvine Ranch Water District
Attn: Authorized Agent
PO Box 57000
Irvine, CA 92619-7000

Lucid Fusion
Attn: Zaynab Behzadnia
8935 Research Dr., #200
Irvine, CA 92618

7
8
9

City of Irvine Atn Brooke Cupell
c/o Wilddan Financial Svcs
7500 N. Dreamy Draw Dr., #130
Phoenix, Arizona 85020

Jackson Demarco
Attn SP Enriquez
2030 Main St., #1200
PO Box 19704
Irvine, CA 92623-9704

Mackler Echt & Associates
Attn: Corporate Officer
9520 Jefferson Blvd., #E
Culver City, CA 90232

10
11
12

CoStar Realty Information, Inc.
Attn: Brian Friedman
PO Box 791123
Baltimore, MD 21279-1123

Jeff Bitetti
8 Tideline Bluff
Newport Coast, CA 92657

Newmeyer & Dillion
Attn: Shawn E. Cowles
895 Dove Street, 5th Fl.
Newport Beach, CA 92660

13
14
15

OCB Reprographics
Attn: Corporate Officer
17721 Mitchell North
Irvine, CA 92614

TCS Network Consulting, Inc.
Attn: Kieth Hermance
9841 Irvine Center Dr., #150
Irvine, CA 92618

Torry Lozano Construction
Attn: Torry Lozano
32025 Virginia Way
Laguna Beach 92651

16
17
18

Pyro-Comm Systems, Inc.
Attn: Corporate Officer
15531 Container Lane
Huntington Beach, CA 92649-1530

The Irvine Company
Attn: John Turner
550 Newport Center Drive
Newport Beach, CA 92660

United Building Services
Attn: Charo Flores
868 Folsum Street
San Francisco, CA 94107

19
20
21

South Coast Water
Attn: Corporate Officer
27881 La Paz Rd., #G-172
Laguna Niguel, CA 29677

The Smith Guide, Inc.
Attn: Jim Smith
18430 Ward Street
Fountain Valley, CA 92708

Ware Malcomb
Attn: Larry Armstrong
10 Edelman
Irvine, CA 92618

22
23
24

**Utility**
Southern California Edison
Attn: Bankruptcy Desk
300 N. Lone Hill Ave.
San Dimas, CA 91773

Tice, Gardener & Fujimoto
Attn: Dave Tice
8845 Research Dr., #100
Irvine, CA 92618

State Fund Attn: Jim Reed
c/o Clarke Marine
245 Fischer Avenue, #D-8
Costa Mesa, CA 92626

25
26
27

NEF 9/9/09
Sheppard Mullin Richter & Hampton
LLP
Richard W. Brunette, Esq.

**Utility**
DirectTV
Attn: Corporate Officer
PO Box 60036
Los Angeles, CA 90060-0036

**Utility**
AT&T Mobility
Attn: Corporate Officer
PO Box 6463
Carol Stream, IL 60197-6463

28

MAINDOCS-#133597-v1-BacchusCCMtn.DOC